**BUD'S RED & WHITE SUPER MARKETS**

v.

**Raymond L. HALPERIN, in his capacity as Tax Assessor for the State of Maine.**

Supreme Judicial Court of Maine.

Jan. 30, 1976.

Eaton, Peabody, Bradford & Veague, by Calvin T. True, Malcolm E. Morrell, Jr., Bangor, for plaintiff.

Jerome S. Matus, Asst. Atty. Gen., Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WERNICK, Justice.

*On report* (from the Superior Court, Penobscot County).

Plaintiff Bud's Red & White Super Markets, a corporation organized and existing under the laws of Maine, is engaged in the business of selling at retail meats, groceries and products of all kinds, including beer and wine, at stores located in Maine. This case concerns plaintiff's operations at stores in Newport and Pittsfield.

As a retailer, plaintiff is required to report and pay sales taxes imposed on its sales at retail by 36 M.R.S.A. § 1751 et seq., (hereinafter the "Act"). Section 1951 of the Act provides:

"Upon application of a retailer, the Tax Assessor shall issue a classified permit establishing the percentage of exempt sales."

The classified permit affords the retailer a simplified method of reporting and paying sales taxes. Under it a predetermined percentage of total sales are taken as non-

taxable, notwithstanding that the retailer lacks such records of sales as, otherwise, may justifiably be held requisite to enable the Assessor to make an independent judgment of the non-taxability of the sales, i. e., records describing in itemized factual detail the nature of the goods involved in sales claimed non-taxable.[1]

In implementation of § 1951 of the Act the Assessor promulgated Regulation No. 13 establishing "temporary" and "permanent" classified permits. The temporary classified permit is issued

" . . . to permit the retailer to take advantage promptly of the simplified reporting made possible by a classified permit."

Because it is issued

" . . . based upon a brief review of the sales of the applicant as reported by the applicant himself",

the temporary permit utilizes a temporary percentage of exempt sales which is

"subject to correction upon audit, and if the temporary percentage is found to be incorrect upon audit, an assessment will be made for additional tax due . . . .",

but the

"interest otherwise applicable to such assessment . . . [is] waived."

The "permanent" classified permit is

"issued after the business of the temporary permit holder has been audited by the Bureau of Taxation"

and the

"permanent percentage . . . [is] based upon such audit."

The taxpayer's use of the

"permanent percentage . . . will not result in any additional assessment or credit upon audit unless some major change in the retailer's business has occurred in the interim."

From January 1, 1973 through January 31, 1974, as to its Pittsfield store, and from March 1, 1973 through January 31, 1974, as to its Newport store, plaintiff reported and paid sales taxes under temporary classified permits. For the Newport store the "temporary" percentage of total sales deemed non-taxable had been fixed at 78.5%, for the Pittsfield store 78.4%. Using these predetermined temporary percentages, plaintiff reported and paid as sales taxes the amount of $16,014.15 for its Newport store and $26,399.87 for its Pittsfield store.

After "audit", the Bureau of Taxation concluded that the temporary percentages fixed for plaintiff's Newport and Pittsfield stores, respectively, had been incorrect and assessments should be made for additional taxes due. Accordingly, by notices dated March 26, 1974, the then State Tax Assessor, Ernest H. Johnson,[2] informed plaintiff that there was a deficiency assessment as to plaintiff's Newport store in the amount of $744.87 and as to plaintiff's Pittsfield store in the amount of $136.43—each deficiency assessment being for the period March 1, 1972 through January 31, 1974.[3]

---

1. Under 36 M.R.S.A. § 2061: "Every retailer shall keep records, the kind and form of which shall be adequate to enable the Tax Assessor to determine the tax liability."

2. Defendant Ernest H. Johnson was the State Tax Assessor until he retired on January 3, 1975. From that date until June 16, 1975 John T. Singer, Deputy Tax Assessor, pursuant to 5 M.R.S.A. § 283, exercised the powers and performed the duties of State Tax Assessor. On June 16, 1975 Raymond L. Halperin became the State Tax Assessor.

Under Rule 25(d)(1) M.R.C.P., Raymond L. Halperin was, as of June 16, 1975, thereupon "automatically" substituted as party defendant in this case and the "[p]roceedings following the substitution" now bear his name as "the substituted party."

3. Although this includes periods antedating the issuance of the temporary classified permits to plaintiff, no portion of the deficiency assessments arises from plaintiff's business operations prior to the issuance of the temporary classified permits.

In compliance with § 1957 of the Act, plaintiff requested the State Tax Assessor to reconsider the deficiency assessments. After an oral hearing the State Tax Assessor, upon reconsideration, decided that the deficiency assessments should remain unchanged.

Thereafter, in accordance with § 1958 of the Act and Rule 80B M.R.C.P., plaintiff prosecuted a timely appeal to the Superior Court. It attacked the legality of the "audit" methodology utilized by the Assessor.

The Assessor's procedure had been as follows:

"In each of . . . four months chosen, the . . . [Assessor], utilizing the *purchase* invoices of the . . . stores, determined the percentage of exempt goods *purchased* by the respective stores to total goods *purchased* by the respective stores. The average percentage of exempt goods *purchased* to total goods *purchased* was then determined for the four months for which *purchase invoices* were actually reviewed. The average percentage so determined was then applied to the total amount of goods *sold* (determined from the Plaintiff's records) for the Newport store for the 11-month period from March 1, 1973 through January 31, 1974 and for the Pittsfield store for the 13-month period from January 1, 1973 through January 31, 1974 to determine taxable sales during the period that the temporary classified permits were in effect." (emphasis supplied)

In the further proceedings in the Superior Court the parties stipulated all relevant facts and agreed on a report of the case. Accordingly, the Justice presiding in the Superior Court, pursuant to Rule 72(b) M.R.C.P., ordered the case reported to this Court for "such final decision as the rights of the parties may require."

The agreed statement of facts shows that plaintiff made records of its actual sales transactions as follows. Plaintiff utilized cash

"registers with the capacity to record taxable sales and provide separate daily print-out sheets showing total taxable sales . . . . To record a taxable sale, the cashier . . . depress[es] one of two buttons on the cash register. If the sale is of a taxable item in the meat, produce, dairy, frozen food or health and beauty aid categories, the cashier . . . push[es] the button labelled Taxable Item —Related Group; if the sale is of any other taxable item, the cashier . . . push[es] the button labelled Taxable Grocery. . . . Plaintiff . . . [makes] a good faith effort to see that taxable sales are properly recorded and . . . that the proper amount of sales tax is collected from its customers. Plaintiff maintains a regular procedure of instructing its cashiers in the operation of the cash registers and on a regular basis reviews, without notice, each cashier's procedures. Plaintiff also undertakes periodic instruction of its cashiers to familiarize them with which goods are subject to sales tax and which goods are exempt from sales tax."

The Tax Assessor has no knowledge of the extent of plaintiff's instruction or of the regularity or efficiency of its review procedures. Plaintiff acknowleges that in light of its large volume of sales, human error in recording sales can occur. Also, plaintiff's records of its actual sales

"[e]xcept for the breakdown into broad categories of goods sold, . . . do not provide detailed itemizations as to the type of goods that make up the sales totals claimed as taxable or tax exempt."

Plaintiff's records of sales were available for review by the Assessor. In conducting his "audit", however, the Assessor took no account of plaintiff's recorded designations of the sales plaintiff identified as taxable.

Plaintiff's contentions are that the Tax Assessor acted arbitrarily and, therefore, illegally by utilizing a methodology for determining plaintiff's tax liability which (1) ignored the information in plaintiff's records of actual sales showing plaintiff's identification of its taxable sales and (2) used plaintiff's records of *purchases* as the basis for establishing the percentage ratio fixing the amount of *sales* to be deemed non-taxable.[4]

Plaintiff points to *Farrar Brown Company v. Johnson,* 161 Me. 75, 207 A.2d 406 (1965) as authority in support of its position. In that case this Court quoted from *State ex rel. Foster v. Evatt,* 144 Ohio St. 65, 56 N.E.2d 265, 281 (1944):

> " 'We find no justification . . . for making assessments against vendors according to a flat rate, a weighted average percentage or any mathematical probabilities.' " (p. 83 of 161 Me., p. 410 of 207 A.2d)

In the same vein, *Farrar Brown* mentioned that the Act expressly authorizes determinations of tax liability by "estimate" only in the contexts of "arbitrary assessments" (§ 1954) and "jeopardy assessments" (§ 1956). The opinion then commented:

> "Most significant is the fact that under the section providing for further audit or investigations to determine a deficiency tax there is no authority to make a determination on the basis of . . . projection . . ." (p. 81 of 161 Me., p. 409 of 207 A.2d);

and further:

> "It is reasonable to deduce that had the Legislature intended to authorize a determination of a deficiency tax by . . . projection . . . it would

have so provided in the same general manner as it did for *estimates* . . . ." (p. 83 of 161 Me., p. 410 of 207 A.2d)

Plaintiff maintains that these statements in *Farrar Brown,* supra, establish that it was here unlawful for the Assessor to project, by formula, the amount of the retailer's tax liability (as imposed upon the *sales at retail* actually made by plaintiff) from the plaintiff's records of its *purchases* of commodities.

In thus arguing, plaintiff overreads the decisional import of *Farrar Brown.*

*Farrar Brown* dealt with a wholesaler and emphasized:

> "There is a marked distinction between the application of the sales and use tax law against a wholesaler as compared with a retailer. The wholesaler is not liable for a sales tax on any tangible personal property sold for resale but only when sold by the wholesaler at retail. In order to facilitate the determination of tax liability, the State Tax Assessor has issued Regulation #1 relating to the sale of taxable personal property for resale. *The seller is relieved of the burden of proof 'if he requires from his purchaser a resale certificate . . . .'*" (p. 82 of 161 Me., p. 409 of 207 A.2d) (emphasis supplied)

More specifically in this regard, the taxpaying wholesaler in *Farrar Brown*

> "operated its business through the use and effect of resale certificates"

and had

> ". . . on file in its main office 2000 resale certificates." (p. 82 of 161 Me., p. 409 of 207 A.2d)

---

4. In its complaint to the Superior Court plaintiff had claimed an additional impropriety in the Assessor's "audit"—that even if it was proper for the Assessor to project the amount of plaintiff's taxable sales from the percentage of its total purchases, the percentage to be applied should be determined from a review of purchases for the entire period under audit rather than, as was done here, from a review of purchases in only four randomly selected months.

This claim has been waived before this Court.

By virtue of Regulation No. 1, these resale certificates were

> "evidence . . . [sufficient to establish] no tax liability on the personal property described in the certificate." (p. 81 of 161 Me., p. 409 of 207 A.2d)

The wholesaler was thus relieved of the burden to produce anything more to prove, at least prima facie, the non-taxability of the sales for which there were resale certificates.

It is thus plain that *Farrar Brown* decided only, and no more than, (1) the Justice presiding in the Superior Court was justified in concluding that the records of the plaintiff for all of the 23 months involved in the period at issue and which were available to the Assessor for review were

> "adequate to satisfy the requirements of . . . [Section 2061 of the Act]" (p. 86 of 161 Me., p. 411 of 207 A.2d)

—i. e.,

> ". . . adequate to enable, the Tax Assessor to determine the tax liability";

and (2) since

> "plaintiff . . . [was] engaged in a wholesale . . . business; . . .

in which the "lines of merchandise . . . frequently change; . . ." and

> "resale certificates play a major part in the determination of tax liability, . . ." (p. 84 of 161 Me., p. 410 of 207 A.2d),

the Assessor acted illegally in confining his actual "auditing" (as constituted by checking the resale certificates against the invoices of the customers to whom the wholesaler had sold for resale) to a spot-check test period of four months and projecting the "margin of error" found in the spot-check period to the other 19 months involved in the period under scrutiny and for all of which the taxpayer had records adequate for the determination of tax liability.

*Farrar Brown* is thus helpful for present purposes only in its emphasis of the important difference in the approach to the adequacy of records, in terms of the burden of proof, in the wholesaler and retailer contexts—that the retailer lacks the benefit of the "resale certificate" available to the wholesaler to serve as prima facie evidence of the wholesaler's non-liability for taxes.

■ That the retailer bears the ultimate burden of proving that a given transaction of sale is not taxable (§ 1763) becomes the fulcrum for decision of the issues now before us.

We view the "classified permit" authorization in § 1951 of the Act as calculated to enable a retailer to escape recordkeeping strictures which otherwise may properly be required to enable the retailer to discharge the ultimate burden of proving the non-taxability of retail sales transactions. In providing the "classified permit" mechanism, the Legislature may reasonably be taken to have had in mind the multitudes of circumstances in which the nature of the retailer's business operations makes virtually impossible the compiling of the kinds of records of sales which, with justification, the Assessor may demand as sufficient to meet the retailer's ultimate burden of proof, viz., records showing not merely the retailer's conclusory designations of the taxability or non-taxability of sales but itemized, detailed descriptions of the factual nature of the commodities sold from which the Assessor may use his own independent judgment in determining sales tax liability. Cf. *Bouchard, et al. v. Johnson,* 157 Me. 41, 170 A.2d 372 (1961).

Because the classified permit thus enables the retailer to establish an amount of non-taxable sales without need to keep the kinds of records which would be necessary absent the classified permit procedure, the classified permit cases will tend to be those in which the retailer's records of sales omit detailed descriptions of the commodities sold; a retailer compiling such detailed rec-

ords would seem to have little reason to apply for a classified permit.

The instant situation is a concrete example of this expectable pattern. Here, the Assessor justifiably may regard the taxpayer's records of retail sales as insufficient to meet the taxpayer's ultimate burden of proving the non-taxable transactions because—despite plaintiff's care to record total sales in a manner indicating those of taxable and non-taxable commodities, and beyond plaintiff's acknowledgement that its large volume of sales may produce human error in the recording of sales—plaintiff's records of sales failed to provide itemized, detailed factual identification of what was sold, thereby to provide the Tax Assessor with a factual basis on which he could arrive at an independent judgment of the taxability or non-taxability of plaintiff's sales.

We thus confront the root problem of this case. Since plaintiff's records of sales may properly be taken by the Tax Assessor to be inadequate to meet the burden of proof reposing upon plaintiff to establish its non-taxable sales *in fact* but yet, under its "classified permit" plaintiff is authorized to *deem* a fixed percentage of its total sales to be non-taxable (regardless of whether they be so in fact), from what records, and on what basis, is such fixed percentage ratio to be established?

With the question for decision thus framed, we interpret plaintiff's position to be the following. Even if *outside the context of the classified permit* the Assessor could justifiably hold plaintiff's records of sales insufficient to meet plaintiff's burden of proof, the purpose of affording plaintiff the benefits of the classified permit must be to authorize the taxpayer's records of sales—as here made with good faith diligence and by a method calculated to mini-

mize human error—to be a sufficient basis for the determination of the proper percentage for exempt sales.

The State Tax Assessor's response is that plaintiff's view would make the classified permit self-defeating. Were the Assessor required to determine the fixed percentage rate for exempt sales from the retailer's records of actual sales, despite their deficiency in failing to identify in detail the factual nature of the commodities sold, the Assessor would, in effect, be deprived of realistic opportunity to determine tax liability by exercise of the independent judgment which it is plainly the legislative intention that he shall bring to bear. The Assessor maintains that if he is to make a truly independent judgment of tax liability in the instant classified permit context, he must be permitted to resort to a methodology of "audit" which reasonably utilizes the retailer's records of *purchases*. These records show in itemized detail the factual nature of the commodities comprising the source from which the actual sales at retail are made.[5] Further, since the classified permit functions by the mechanism that a *predetermined* percentage ratio fixes the amount of non-taxable sales, it is surely appropriate to find such *advance* percentage indication precisely in the percentage ratio shown by the retailer's purchases for inventory *as existing in advance* of the actual sales to consumers.

We agree with the Assessor's position.

We have already explained that plaintiff gains nothing from the contention that the "projection", or "formula", features of the methodology here used by the Assessor render it impermissible for the determination of tax liability. Such claim rests on an improper overreading of *Farrar Brown Company v. Johnson,* supra. As previously stated, *Farrar Brown* does not decide, broadly, that the Act forbids resort to formula, or projection, in the determination of

---

5. Regulations promulgated by the Assessor under authority of Section 1901 of the Act to carry into effect Section 2061 require that to be "adequate" the records of each retailer must include, as documents of original entry, the "invoices" supportive of the "total purchase price of all tangible personal property purchased for resale" shown in the records.

tax liability (except in the special contexts of "arbitrary" and "jeopardy" assessments). In *Farrar Brown* the wholesaler had records for the full period under investigation adequate to prove, prima facie, the wholesaler's claims of non-taxable transactions. In terms of these facts *Farrar Brown* decides only that it was beyond the authority of the Assessor to project a margin of error derived from a spot-check of four months of the period under investigation to the other nineteen months of the period.

In any event, plaintiff's contention of the impermissibility of the use of formulas plainly fails in the instant context in which we are concerned, specifically, with the mechanism of a "classified permit." As expressly authorized by § 1951 of the Act, the essence of the classified permit is precisely a resort to an artificial formula for determining the taxability and non-taxability of sales actually made. A percentage determined in advance of actual sales *attributes* non-taxability to some of them regardless of whether, as made in fact, the sales would reflect the same ratio of exempt sales. In short, formula and projection are the very substance of the classified permit. Cf. *Sampson-Sawyer Co., Inc. v. Johnson,* 156 Me. 544, 167 A.2d 1 (1960).

■ Plaintiff contends that use of the retailer's records of purchases as the basis for fixing the predetermined percentage of exempt sales gives rise to inaccuracy because of differences in the mark-ups of taxable and non-taxable commodities, and losses (by theft, breakage or spoilage) intervening between the retailer's purchases and sales of commodities.

In these respects, however, nothing here shows that the use of the retailer's records of purchases produces a fixed pattern of inaccuracy consistently detrimental to the taxpayer.

Even if it is reasonable to hypothesize differences in the mark-ups of individual taxable and non-taxable commodities, it does not follow that the total mark-up of all taxable commodities compares to that of all non-taxable commodities other than as equivalent. Hence, we find no basis to hold unreasonable, here, the expert judgment of the Assessor, implicit in the methodology here utilized, that the mark-ups on taxable and non-taxable goods are considered equivalent.

Similarly, as to potential losses of commodities in the interval between the plaintiff's purchases and sales of its stock, nothing in the instant record suggests that the losses follow a pattern of affecting taxable more than non-taxable goods, or vice-versa, in a manner tending to prejudice the taxpayer. Thus, nothing, here, impairs the validity of the Assessor's expert judgment, as an underlying premise of his method, that taxable goods and non-taxable goods purchased by the taxpayer for resale are sold at retail in the same ratio as that by which they are purchased.

Plaintiff complains that the Assessor's resort to plaintiff's records of purchases to determine the percentage for exempt sales must be held impermissible because it here resulted in a reduction of the amount of "breakage" to be retained by plaintiff (under § 1812 of the Act) as compensation for collecting sales taxes.[6] Independently of the point that a result produced in a single instance by the Assessor's methodology of audit would not require a conclusion that the method is inherently infirm, plaintiff wrongly describes the true breakage conse-

---

6. Section 1812 of the Act prescribes a fixed schedule of the amounts of applicable sales tax that the retailer is required to add to each customer's total sale price. By operation of this schedule the retailer generally will collect sales taxes at an effective rate of more than 5%, yet his tax liability is only 5% of the total amount of taxable sales. "Breakage" is this difference between the amount the retailer collects from customers on the sales of taxable goods and the amount the retailer is required to pay as tax liability.

quences of the present situation because plaintiff starts from an incorrect premise.

■ Plaintiff assumes that the amount of breakage *properly* retainable by him is adequately disclosed by plaintiff's records of sales. This is plaintiff's error. As breakage is defined, an essential element of it is the amount of tax liability. Accordingly, the *proper* amount of breakage is known only when the *correct* amount of tax liability has been ascertained. As we have repeatedly asserted herein, the postulate of our present decision is that the Assessor is justified in holding the plaintiff's records of sales, taken within their own confines, to be insufficient to meet plaintiff's ultimate burden of proving its actual tax liability. Since plaintiff's records of sales are thus inadequate to show the correct amount of plaintiff's tax liability, they leave speculative the proper amount of breakage and, therefore, cannot provide a legitimate basis for a comparison by which to hold the Assessor's methodology unlawful because it produces an amount of breakage lower than that indicated by plaintiff's records of sales.

The entry is:

(1) It is adjudicated that the Assessor's method of "audit" is, in all the circumstances of this case, a reasonable exercise of the Assessor's authority to determine plaintiff's sales tax liability.

(2) Case remanded to the Superior Court for entry of judgment in accordance with the opinion herein.

All Justices concurring.